Valerie A. Szczepanik
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – Room 400
New York, New York 10281-1022
(212) 336-0175

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | 07 CIV 8849 (PKC) |
| COLONIAL INVESTMENT | : | ELECTRONIC FILING |
| MANAGEMENT LLC, | : | |
| COLONIAL FUND LLC, and | : | |
| CARY G. BRODY, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

RULE 105 OF REGULATION M...............................................................................3

ARGUMENT.................................................................................................................5

    I. THE COMPLAINT SATISFIES RULE 12(b)(6) BECAUSE IT ALLEGES
    FACTS SUFFICIENT TO STATE A PLAUSIBLE CLAIM FOR INJUNCTIVE
    RELIEF.......................................................................................................................5

        A.  The Complaint Alleges a Likelihood of Recurrence of Violative Conduct.......5

        B.  Legal Precedent Exists for Granting Equitable Relief Under a Revised
        Regulation ...........................................................................................................9

            1.  The Commission is Entitled to Seek, and the Court Has Broad Power to
            Grant, Equitable Relief to Protect Investors ...............................................9

            2.  This Court has Granted Equitable Relief to the Commission Under a
            Revised Securities Law Regulation ..........................................................11

    II. DEFENDANTS' ARGUMENT THAT THE COMMISSION AMENDED RULE
    105 RETROACTIVELY IS A RED HERRING AND IS INCORRECT ....................14

        A.  Defendants' Rule 105 Violations Occurred Before They Engaged in Sham
        Transactions ......................................................................................................14

         B.  The Commission Releases Did Not Change the Meaning of Rule 105 or
        Attempt to Prohibit Conduct Not Already Encompassed by Rule 105 ................16

            1.  The Commission Simply Stated That It Had Taken Action, and Would
            Continue to Take Action, With Respect to Conduct Designed to Evade
            Rule 105 .....................................................................................................16

            2.  The Commission is Free to Make Specific Interpretations of General
            Rules on a Case-By-Case Basis in Adjudicatory Proceedings ..................21

            3.  "Sham Transactions" Have Long Been Considered Manipulative
            Devices.......................................................................................................22

    III. PLAINTIFF'S CLAIMS FOR DISGORGEMENT, PREJUDGMENT INTEREST
    AND CIVIL PENALTIES, AND PLAINTIFF'S ALLEGATIONS NOT INVOLVING
    SHAM TRANSACTIONS REMAIN UNCHALLENGED .........................................24

IV.  IF THE COURT GRANTS DEFENDANTS' MOTION, THE COMMISSION
SHOULD BE AFFORDED AN OPPORTUNITY TO REPLEAD ...............................25

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) .........................................5

Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007) ..............................................5, 6

Bowles v. May Hardwood Co., 140 F.2d 914 (6th Cir. 1944)................................................10, 11

Bowles v. Royal Wine & Liquor, Inc., 155 F.2d 137 (7th Cir. 1946) ...........................................11

Edward J. Mawod & Co. v. SEC, 591 F.2d 588 (10th Cir. 1979) ...........................................22, 24

Erickson v. Pardus, __ U.S. __, 127 S. Ct. 2197 (2007)................................................................5

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)................................................................22, 24

In re Americorp Secs. Inc., 1999 SEC LEXIS 1593 (Aug. 11, 1999) ...........................................12

In re Ascend Capital, LLC, 2003 SEC LEXIS 1659 (Jul. 17, 2003)................................16, 17, 18

In re A.S. Goldmen & Co., Inc., 2002 SEC LEXIS 3252 (Dec. 19, 2002) ....................................12

In re Bear Stearns & Co., 1991 CFTC LEXIS 46 (Jan. 25, 1991)................................................22

In re Collins, 1986 CFTC LEXIS 661 (Apr. 4, 1986), rev'd on other grounds sub nom.
    Stoller v. CFTC, 834 F.2d 262 (2d Cir. 1987)....................................................................22

In re Enron Corp. Secs. Derivative & "ERISA" Litig., 310 F. Supp. 2d 819 (S.D. Tex.
    2004) ................................................................................................................................23

In re Goldman Sachs Execution & Clearing, LP, 2007 SEC LEXIS 491 (Mar. 14, 2007) ...........12

In re Graham, 1998 SEC LEXIS 2598 (Nov. 30, 1998), aff'd on other grounds, 222 F.3d
    994 (D.C. Cir. 2000) ........................................................................................................23

In re Jett, 2004 SEC LEXIS 504 (Mar. 5, 2004) ........................................................................23

In re KPMG Peat Marwick LLP, 2001 SEC LEXIS 98 (Jan. 19, 2001), reh'g denied, 55
    S.E.C. 1 (2001), pet. denied, 289 F.2d 109 (D.C. Cir. 2002). ...............................................21

In re Price, 1998 SEC LEXIS 692 (Apr. 19, 1998) .....................................................................12

In re Thornton & Co., 1948 SEC LEXIS 432 (Jul. 14, 1948), aff'd, 171 F.2d 702 (2d Cir. 1948) ...................................................................................................................23

In re XCEL Energy, Inc. Secs., Derivative & "ERISA" Litigation, 286 F. Supp. 2d 1047 (D. Minn. 2003) .....................................................................................................23

International Brotherhood of Teamsters v. United States, 291 U.S. 293 (1934)...........................10

Iqbal v. Hasty, 490 F.3d 143 (2d. Cir. 2007) ..............................................................................5

Log on America v. Promethean Asset Management LLC, 223 F. Supp. 2d 435 (S.D.N.Y. 2001) ....................................................................................................................25

NLRB v. Express Pub. Co., 312 U.S. 426 (1941) ....................................................................9, 10

Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977) ..................................................................24

SEC v. Alexander, 160 F. Supp. 2d 642 (S.D.N.Y. 2001)...............................................................7

SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998) ...........................................................................8

SEC v. Chenery Corp., 332 U.S. 194 (1947)..........................................................................21, 22

SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 80 (2d Cir. 1978)........................................12

SEC v. Drescher, 1999 U.S. Dist. LEXIS 16033 (S.D.N.Y. Oct. 19, 1999) ..............................7, 8

SEC v. Essaye, 1995 SEC LEXIS 1796 (Jul. 26, 1995) ...............................................................17

SEC v. Everest Mgmt. Corp., 1982 U.S. Dist. LEXIS 14346 (S.D.N.Y. Jul. 30, 1982).........11, 12

SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)............................................................8

SEC v. Hopper, 2006 U.S. Dist. LEXIS 17772 (S.D. Tex. Mar. 24, 2006) ..................................23

SEC v. Ivey, 1994 SEC LEXIS 1068 (Apr. 5, 1994)....................................................................17

SEC v. Kimmes, 799 F. Supp. 852 (N.D. Ill. 1992), aff'd sub nom., SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993) .......................................................................................24

SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082 (2d Cir. 1972)...........................................7, 24

SEC v. Mersky, Civ. Act. No. 93-CV-5200 (E.D. Pa. Jul. 28, 2006)............................................12

SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ..................................................................................9

SEC v. Power, 2007 U.S. Dist. LEXIS 87632 (S.D.N.Y. Nov. 29, 2007) ............................6, 7, 8

SEC v. Rathi, 2003 SEC LEXIS 1805 (Jul. 31, 2003).................................................................23

SEC v. Tome, 638 F. Supp. 638 (S.D.N.Y. 1986), aff'd 833 F.2d 1086 (2d Cir. 1987)...............24

SEC v. Universal Major Indus., 546 F.2d 1044 (2d Cir. 1976)....................................................12

SEC v. U.S. Envtl. Inc., 2003 U.S. Dist. LEXIS 12580 (S.D.N.Y. Jul. 21, 2003), aff'd.,
    2004 U.S. App. LEXIS 22548 (2d Cir. 2004) ......................................11, 12, 13, 14

United States v. Jones, 900 F.2d 512 (2d Cir. 1990) ..................................................................23

United States v. Stein, 456 F.2d 844 (2d Cir. 1972)....................................................................23

United States v. St. Regis Paper Co., 106 F. Supp. 286 (S.D.N.Y. 1952)....................................10

## FEDERAL STATUTES

15 U.S.C. § 78b.........................................................................................................................23

15 U.S.C. § 78t(b)......................................................................................................................18

15 U.S.C. § 78u (d)(1) .................................................................................................................9

15 U.S.C. § 78u (d)(5) .................................................................................................................9

15 U.S.C. § 78u(d)(3)................................................................................................................24

17 C.F.R. §242.105(a) (2006)......................................................................................................2

17 C.F.R. §242.105(a) (2007)......................................................................................................2

## MISCELLANEOUS

Anti-manipulation Rules Concerning Securities Offerings, 1996 SEC LEXIS 3482 (Dec.
    20, 1996) .....................................................................................................3, 4, 13

Anti-Manipulation Rules Concerning Securities Offerings, 62 Fed. Reg. 520 (Jan. 3,
    1997) ...................................................................................................................13

Charles R.P. Pouncy, The Scienter Requirement and Wash Trading in Commodity
    Futures: The Knowledge Lost in Knowing, 16 Cardozo L. Rev. 1625 (1995)........................22

H.R. Rep.  No. 1383, 73d Cong., 2d Sess. 11 (1934) ............................................................23, 24

Short Sales, 68 Fed. Reg. 62972 (Nov. 6, 2003) ....................................................................16, 17

Short Sales, 69 Fed. Reg. 48008 (Aug. 6, 2004) ...........................................................4, 17, 18, 21

Short Sales in Connection with a Public Offering, 1988 SEC LEXIS 1706 (Aug. 25,
    1988) ...................................................................................................................................4, 18

Short Selling in Connection with a Public Offering, 72 Fed. Reg. 45094
    (Aug. 10, 2007) .........................................................................................13, 14, 18, 19, 23, 24

S. Rep. No. 1455, 73d Cong., 2d Sess. 81 (1934) .......................................................................23

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in opposition to the motion of Defendants Colonial Investment Management, LLC ("CIM"), Colonial Fund LLC ("Colonial"), and Cary G. Brody ("Brody") (collectively, the "Defendants") to dismiss the Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Defendants move to dismiss the Complaint on the ground that it fails to allege facts sufficient to support a reasonable likelihood that Defendants will engage in future wrongdoing, and on the ground that the Commission's interpretive guidance regarding sham transactions amounts to a new rule *ex post facto*. At the outset, Defendants' motion completely overlooks Plaintiff's claims for disgorgement, prejudgment interest and civil penalties, which exist separate and apart from its claim for injunctive relief. Furthermore, Defendants do not challenge the eight instances of alleged violative conduct that did not involve the use of sham transactions. Defendants have made no argument that Plaintiff's claims for disgorgement, prejudgment interest and civil penalties, or its claims based on eight of the specifically alleged eighteen transactions, are insufficient.

Moreover, the grounds for Defendants' motion have no merit. The Complaint sets forth all the facts necessary to satisfy Rule 12(b)(6) because it alleges that Defendants engaged in no less than eighteen separate violations of Rule 105 of Regulation M ("Rule 105") under the Securities Exchange Act of 1934 ("Exchange Act") and, for ten of those eighteen violations, after committing the violation, Defendants engaged in sham transactions in an effort to conceal the violation. By their unlawful trading, Defendants secured profits in excess of $1.48 million.

Without citation to any precedent and without addressing controlling precedent to the contrary, Defendants argue that equitable relief under an existing regulation cannot be granted for violations of the existing regulation's predecessor. They reason that a subsequent amendment to Rule 105 precludes the Commission from seeking injunctive relief "because the violative act in the new Rule 105 was permitted by the old rule." (Def. Br. at 1.) Such reasoning turns logic on its head. In determining whether injunctive relief should be granted, the focus must be on Defendants' alleged conduct. The conduct alleged here expressly was prohibited by Rule 105, as it existed at the time of the conduct and as it exists now. By their conduct, Defendants violated both the former and amended versions of Rule 105 and are likely to engage in acts to violate the Rule, as amended, in the future.

More specifically, former Rule 105 prohibited Defendants from taking essentially three steps: (1) short selling prior to an offering, (2) purchasing shares in the offering and (3) covering the pre-offering short position with the shares purchased in the offering.[1] Rule 105, as amended, prohibits taking two of those steps, so that: (1) if you short sell prior to an offering, you cannot also (2) purchase shares in the offering.[2] Defendants' assertion that Plaintiff "has failed to allege any violations of the rule in its current form," (Def. Br. at 5), simply is incorrect. In each alleged

---

[1]  Rule 105, in effect at the time of the conduct alleged in the Complaint, provided in pertinent part: "In connection with an offering of securities for cash pursuant to a registration statement...filed under the Securities Act, it shall be unlawful for any person to cover a short sale with offered securities purchased from an underwriter or broker or dealer participating in the offering, if such short sale occurred during the [Restricted Period]." 17 C.F.R. §242.105(a) (2006).

[2]  Amended Rule 105, which became effective October 9, 2007, provides in pertinent part: "In connection with an offering of equity securities for cash pursuant to a registration statement ... filed under the Securities Act ..., it shall be unlawful for any person to sell short ... the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the [Restricted Period]." 17 C.F.R. §242.105(a) (2007).

instance, Defendants' conduct violated both versions of the rule because, in each alleged
instance, Defendants took all violative steps.

Not only did Defendants' conduct with respect to at least eighteen separate offerings
violate the letter and spirit of Rule 105 (both versions), but Defendants themselves subsequently
engaged in sham transactions designed to conceal their violations. Under these circumstances,
the Commission has alleged a reasonable likelihood of Defendants' future violations of Rule
105, as amended. Defendants' arguments ignore the specific paragraphs of the Complaint that
detail why there is a reasonable likelihood they will commit future violations of Rule 105. The
arguments also ignore controlling precedent.[3]

## **RULE 105 OF REGULATION M**

Rule 105 was adopted by the Commission in part to prevent manipulative conduct by
persons with an interest in the outcome of an offering of securities and to ensure that price
movements prior to offerings are the result of natural market forces. Anti-manipulation Rules
Concerning Securities Offerings, 1996 SEC LEXIS 3482, **1-2 (Dec. 20, 1996). Specifically,
the Commission adopted Rule 105, as well as its predecessor, Rule 10b-21, in an effort to
prevent manipulative short-selling prior to a public offering by short sellers who cover their short
position with securities purchased in the offering, thus largely avoiding exposure to market risk.

---

[3] In support of their argument, Defendants attempt to borrow from a cell phone analogy first
raised by the Court during a status conference. Defendants posit: "[I]f the Defendants were
alleged to have violated a rule prohibiting talking on cell phones while driving, then those
allegations would [not] be sufficient … to find a reasonable likelihood that the Defendants would
violate a new rule prohibiting cell phones in cars." (Def. Br. at 1.) Defendants' use of the cell
phone analogy is incomplete. If properly analogized to the instant case, the cell phone law
violator would also have talked on his cell phone in the car on at least eighteen separate
occasions, while at the same time knowing it is against the law to do so, and while also taking
steps to conceal his cell phone use by, for example, tinting his windows. Under those
circumstances, it is reasonably likely that the cell phone law violator will continue, not only to
violate the new law by taking his cell phone into the car, but also to use the cell phone in the car.

Id. at *115.  In adopting predecessor Rule 10b-21, the Commission explained the Rule's

rationale:

> Short selling involves sales of stock that the seller does not own. These sales are made
> with the expectation that the market price of the stock will be lower at the time of the
> covering transactions. This selling entails the risk that the security's price might increase
> or the security's supply might be limited. The Commission believes that legitimate short
> selling activity contributes to the efficient pricing of securities. The activity prohibited by
> the Rule differs, however, from short selling as usually practiced because a short seller
> who covers from an offering has access to a pool of securities obtainable from
> identifiable sources at prices based upon market values that can be adversely affected by
> the short seller's activity. No such pool of securities or pricing relationships are, however,
> available for short selling activity as usually practiced. The market risk facing short
> sellers who cover their positions from the offering can therefore be less than the market
> risk that generally faces short sellers. This lower degree of risk can, in turn, provide the
> incentive for manipulative short selling. Because it results in a level of short selling
> activity greater than that which would otherwise occur in the secondary market for the
> issuer's shares, that manipulative short selling can cause an artificial price decline around
> the time of the offering.

Short Sales in Connection with a Public Offering, 1988 SEC LEXIS 1706, **10-11 (Aug. 25,

1988).

Rule 105's prohibitions are prophylactic and apply irrespective of a short seller's intent in

effecting the short sale.  See Short Sales, 69 Fed. Reg. 48008, *48026 (Aug. 6, 2004); see also

Short Sales in Connection with a Public Offering , 1988 SEC LEXIS 1706, at *8 ("[T]he Rule

will serve an important purpose by avoiding the difficult proof problems involved in

demonstrating manipulative purpose.").  In adopting the Rule, the Commission reasoned that "a

prophylactic approach to anti-manipulation regulation is the most effective means to protect the

integrity of the offering process by precluding activities that could influence artificially the

market for the offered security." Anti-manipulation Rules Concerning Securities Offerings,

1996 SEC LEXIS 3482, at *6.

Defendants here largely avoided market risk by covering short sales with a supply of

offered securities purchased at a price generally fixed lower than the prevailing market price.

4

When the Defendants sold short within five business days before the pricing of a follow-on

offering subject to Rule 105, and then covered their short positions using shares purchased in the

offering, they violated Rule 105.

## ARGUMENT

I.   **THE COMPLAINT SATISFIES RULE 12(b)(6) BECAUSE IT ALLEGES FACTS SUFFICIENT TO STATE A PLAUSIBLE CLAIM FOR INJUNCTIVE RELIEF**

A.   **The Complaint Alleges a Likelihood of Recurrence of Violative Conduct**

On a Motion to Dismiss under Rule 12(b)(6), the Court must accept all factual allegations

in the complaint and draw all reasonable inferences in the Plaintiff's favor.  ATSI Communs.,

Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  A plaintiff is not required to set out in

detail the facts on which it bases its claims.  Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct.

1955, 1964-65 (2007).  All that is necessary is a short and plain statement of the claim that will

give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

Erickson v. Pardus, __ U.S. __, 127 S. Ct. 2197, 2200 (2007) (citations omitted).

To withstand a motion to dismiss, a plaintiff must provide the grounds upon which the

claim rests through factual allegations sufficient "to raise a right to relief above the speculative

level."  Twombly, 127 S. Ct. at 1965.  Once a claim has been adequately stated, it may be

supported by showing any set of facts consistent with the allegations in the complaint.  Id. at

1969.  See Iqbal v. Hasty, 490 F.3d 143, 158 (2d. Cir. 2007) (The complaint must set forth

sufficient factual allegations "to render a claim plausible"); Twombly, 127 S. Ct. at 1965

("plausible grounds" does not "impose a probability requirement at the pleading stage; it simply

5

calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the violation].").[4]

To survive a motion to dismiss a claim for injunctive relief, the Commission must allege a likelihood of recurrence of violative conduct. See, e.g., SEC v. Power, 2007 U.S. Dist. LEXIS 87632, at *29 (S.D.N.Y. Nov. 29, 2007). The Complaint's allegations include the following:

- Between 2001 and 2004, Defendants violated Rule 105 when they used shares purchased in at least eighteen registered public offerings to cover short sales that occurred during the five business days before the pricing of those offerings (the "restricted period"). Defendants realized profits from this illegal trading in excess of $1.48 million ... . (Compl. ¶ 1.)

- At all relevant times, Defendant Brody, and through him Defendant CIM, made all major trading and investment decisions on behalf of Colonial. Defendant Brody directed, authorized, and/or supervised the trading of the securities that are at issue in this Complaint, including the covering transactions that are alleged to have violated Rule 105 and post-cover sham transactions that were executed to conceal the violations. (Compl. ¶ 3.)

- In general, the purpose of Rule 105 is to prevent manipulative trading prior to public offerings by short sellers who could largely avoid exposure to market risk by using shares purchased at a discount in a registered offering to cover restricted period short positions. Short sales by those who know or have a high degree of assurance that they will be able to obtain discounted shares in a registered offering artificially distort the market and erode the integrity of the offering price. (Compl. ¶ 14.)

- The Commission amended Rule 105 effective October 9, 2007. The amended rule generally prohibits purchasing a security in a registered offering if the buyer has a restricted period short position in that security. The Defendants' conduct alleged in this Complaint would violate the amended Rule 105 as well. (Compl. ¶ 15.)

- Defendants continued to violate Rule 105 even after they knew on or about July 17, 2003 that the Commission staff was investigating Defendants' participation in certain equity offerings. Despite having actual notice of the Commission's investigation, Defendants

---

[4] This is not a case like the one at issue in Twombly, where the Court was asked to infer unlawful conduct from facts that were just as consistent with lawful conduct as unlawful conduct. In Twombly, the plaintiff alleged an antitrust conspiracy by pointing to parallel conduct. Twombly, 127 S. Ct. at 1966. But, as the Court noted, parallel conduct could "just as well be independent action," id., and without more, it raised only the possibility of an illicit agreement. Here, taken as true, Defendants' acts are unlawful on their face, and are completely inconsistent with lawful conduct.

continued to violate Rule 105, committing fourteen of the eighteen violations described above after July 17, 2003. Defendants committed nine of the ten violations involving the use of sham transactions after learning of the Commission's investigation. (Compl. ¶ 52.)

- Defendants also continued to violate Rule 105 and engage in sham transactions designed to conceal their violations even after the Commission issued a statement explaining that it had taken action, and would continue to take action, against those participating in the type of contemporaneous purchase and sales sham transactions utilized by the Defendants to violate Rule 105. ... Twelve of the eighteen violations discussed herein occurred after the date of the Proposing Release and seven of those twelve involved sham transactions such as those addressed in the Proposing Release. (Compl. ¶ 53.)

- The Commission is informed and believes and on that basis alleges that during 2004 and 2005 Defendants may have committed further violations of Rule 105 in connection with additional registered offerings by covering restricted period short sales with shares purchased in the registered offerings. (Compl. ¶ 51.)

- Defendant Brody was familiar with the prohibitions of Rule 105. (Compl. ¶ 18.)

- Despite Defendant Brody's awareness of Rule 105, his knowledge of Colonial's use of the FIFO method, and his responsibility as Colonial's head trader and adviser, he failed to institute sufficient internal controls or otherwise establish an adequate system to monitor for and prevent Colonial's violations of Rule 105. (Compl. ¶ 54.)

- In light of Defendants' numerous and repeated past violations of Rule 105, and their brazen use of sham transactions to conceal their violative trading, it is likely that Defendants will continue to violate Rule 105, even as that rule has been amended, in the future. (Compl. ¶ 55.)

The allegations of repeated conduct alone here are sufficient to meet the Commission's burden to allege likelihood of recurrence. See Power, 2007 U.S. Dist Lexis 87632, **29-30 ("[T]here is significant precedent in this circuit for granting injunctive relief of the kind sought here based upon allegations of past violations.") (citing SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972) ("[F]raudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."); SEC v. Alexander, 160 F. Supp. 2d 642, 655 (S.D.N.Y. 2001) (holding that the Commission properly pleaded claim for injunctive relief, as "[p]otential future violation of the securities laws can be inferred from past violations"); SEC v.

Drescher, 1999 U.S. Dist. LEXIS 16033, at *15 (S.D.N.Y. Oct. 19, 1999) ("In alleging Drescher

violated the securities laws, the SEC has adequately stated a claim for injunctive relief.")).  But

the facts alleged here go even further – they allege a pattern of repeated and knowing misconduct

over a period of several years, and the creation of sham transactions designed to conceal that

misconduct.  See Power, 2007 U.S. Dist. LEXIS 87632, **30-31 (listing factors a court may

consider in determining whether there is a reasonable likelihood of future violations, such as: (1)

the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature

of the violations; and (4) the sincerity of defendant's assurances against future violations) (citing

SEC v. Haligiannis, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007); SEC v. Cavanagh, 155 F.3d 129,

135 (2d Cir. 1998)).[5]  These allegations adequately allege a likelihood that Defendants will

continue to violate Rule 105, even as amended.

Defendants' argument that Plaintiff has set forth "no factual allegations that [Defendants

are] reasonably likely to repeat the same wrongdoings in the future than those in which [they]

engaged in the past [Def. Br. at 6]" is wrong.  Plaintiff specifically has alleged: "In light of

Defendants' numerous and repeated past violations of Rule 105, and their brazen use of sham

transactions to conceal their violative trading, it is likely that Defendants will continue to violate

Rule 105, even as that rule has been amended, in the future [Compl. ¶ 55]."  Likewise,

Defendants' statement that, "there is no possibility that past violative conduct will be repeated,

because the conduct that formed the predicate of the past alleged violations is no longer the same

conduct that is proscribed by the rule currently in place [Def. Br. at 6]" is wrong.  If the same

exact conduct was repeated by Defendants in the future, as Plaintiff alleges is likely, that conduct

---

[5] As the issue whether injunctive relief is appropriate involves the Court's consideration of these,
and other factors, dismissing the Complaint on the issue of relief also is premature at this stage in
the litigation.

would violate Rule 105, as amended.

**B.    Legal Precedent Exists for Granting Equitable Relief Under a Revised Regulation**

    **1.    The Commission is Entitled to Seek, and the Court Has Broad Power to Grant, Equitable Relief to Protect Investors**

The Commission's power to seek, and the federal courts power to grant, equitable relief in injunctive actions brought to remedy violations of the federal securities laws is beyond question. See SEC v. Posner, 16 F.3d 520, 521 (2d Cir. 1994). Section 21(d)(1) of the Exchange Act grants the Commission authority to seek injunctive relief against persons engaged in or about to engage in acts or practices constituting violations of the Act or its rules. 15 U.S.C. § 78u (d)(1). Section 21(d)(5) permits the Commission to seek, and the courts to grant, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u (d)(5).

Moreover, it has long been established that, "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." NLRB v. Express Pub. Co., 312 U.S. 426, 435 (1941)[6]; see

---

[6] In Express Publishing, the Supreme Court reversed a judgment that ordered an employer to cease and desist from refusing to bargain collectively and from interfering or retraining their employees in the exercise of their rights to self-organization and other rights guaranteed by the National Labor Relations Act. The Court held that the cease and desist order before it was too broad because the Board had found only that the employer refused to bargain, and so the lower court was not justified in issuing a blanket order that the employer must cease and desist from all other unfair labor practices. Thus, while a federal court has broad power to restrain acts which are of the same type as unlawful acts which the court has found to have been committed or will likely be committed, "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." Express Publishing, 312 U.S. at 435-46. With that proviso, Express Publishing established the "salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts." Id. at 436.

9

also <u>International Brotherhood of Teamsters v. United States</u>, 291 U.S. 293 (1934) (for Sherman Act injunction, "the decree should enjoin acts of the sort that are shown by the evidence to have been done or threatened in furtherance of the conspiracy. It should be broad enough to prevent evasion. In framing its provisions doubts should be resolved in favor of the Government and against the conspirators.").

Under the principle firmly established in <u>Express Publishing</u>, courts have issued injunctions against future violations of amended rules. For example, in <u>United States v. St. Regis Paper Co.</u>, 106 F. Supp. 286 (S.D.N.Y. 1952), this Court was faced with the decision whether to dismiss a complaint for injunctive relief on the basis that the regulations that the defendants were charged with violating were no longer in effect due to superseding regulations. Relying on <u>Express Publishing</u>, the court held that where a regulation "is modified or amended or, as here, superseded by a regulation of similar import, the test is whether the violations proposed to be enjoined 'are so inseparably associated with past unlawful actions or so similar to them in character that inevitably there follows an inference that one who commits one series of acts will likely to commit another of like character.'" <u>St. Regis</u>, 106 F. Supp. at 290 (citing <u>Bowles v. May Hardwood Co.</u>, 140 F.2d 914, 916 (6th Cir. 1944)). The <u>St. Regis</u> court reasoned that the conduct with which the defendants were charged was, and still is, subject to regulations that superseded the old regulations. <u>Id.</u> Similarly, in <u>Bowles v. May Hardwood Co.</u>, 140 F.2d 914 (6th Cir. 1944), cited by the <u>St. Regis</u> court, the Sixth Circuit rejected the argument by a lumber company that there could be no basis for granting an injunction against future violations of the Emergency Price Control Act of 1942, based upon past violations of a regulation setting the ceiling price on a specific lumber. They argued that because that ceiling had been raised by a subsequent regulation, even if they continued sales of such stock at the former prices, they would

10

no longer be violating the applicable regulation. 140 F.2d at 915. The Sixth Circuit held that, because the lumber company had violated the old regulation, it could be anticipated that the company would broach the new. Id. at 916. Moreover, the court specifically noted a policy concern that if past violations would not support injunctive restraining of similar acts, traders could not be brought into compliance with a regulation except by a myriad of injunction suits. Id. at 917; accord Bowles v. Royal Wine & Liquor, Inc., 155 F.2d 137 (7th Cir. 1946) (the Administrator of the Office of Price Administration is entitled to an injunction restraining a liquor business from violating price ceilings that could be established in the future, because it was directed solely at the maximum price for packaged distilled spirits as fixed by the existing regulation, an amended regulation, or a new regulation concerning the same subject manner).

It is time-honored law that past violations may support injunctive relief against similar acts and that courts may fashion equitable relief as appropriate to enjoin the violation of an amended regulation. Any other rule would cripple the Commission's ability to enforce the securities laws. Defendants provide no cogent reason to limit the Commission's power to seek, and the Court's power to grant, injunctive relief here.

## 2.    This Court has Granted Equitable Relief to the Commission Under a Revised Securities Law Regulation

Defendants have not cited to, nor have they addressed, this Court's precedent granting relief to the Commission under a revised securities law regulation where the conduct in question violated the predecessor regulation. In SEC v. U.S. Envtl., Inc., 2003 U.S. Dist. LEXIS 12580 (S.D.N.Y. Jul. 21, 2003), aff'd 2004 U.S. App. LEXIS 22548 (2d Cir. 2004), this Court recognized that, in actions involving "remedial statutes," such as the federal securities laws, the Court has "broad discretion to enjoin future violations of law where past violations have been shown." Id. at *66 (citing SEC v. Everest Mgmt. Corp., 1982 U.S. Dist. LEXIS 14346, *41

11

(S.D.N.Y. Jul. 30, 1982)).  The court held that it was "empowered to issue injunctive relief upon

a proper showing that there is a reasonable likelihood of future violations."  Id. (citing SEC v.

Commonwealth Chem. Secs., Inc., 574 F.2d 80, 99 (2d Cir. 1978)).  In addition to the existence

of past violations from which it can infer future violations, the court held that it could consider

"the degree of scienter involved, the isolated or recurrent nature of the infraction, the nature of

the infraction, the nature of the violations involved, and a defendant's recognition of his

wrongful conduct."  Id. at *67 (quoting Everest Mgmt., 1982 U.S. Dist. LEXIS 14346, at *42);

see SEC v. Universal Major Indus., 546 F.2d 1044, 1048 (2d Cir. 1976).  Applying these

precepts, Judge Leisure, after a bench trial, not only found that Defendants had violated Rule

10b-6 under the Securities Act, 17 C.F.R. § 240.10b-6, but also permanently enjoined them from

violating the successor to that rule – i.e., Rules 101 and 102 of Regulation M.[7]  The Court held:

> On December 18, 1996, the SEC adopted a revision of Rule 10b-6, which became
> effective on March 4, 1997. ... Among other things, this amendment deemed Rules 101
> and 102 of Regulation M as successor rules to Rule 10b-6.  Accordingly, defendants ...
> are permanently enjoined and restrained from violating Rule 101 of Regulation M.

Id. at *87 n.6.[8]

---

[7]  In another civil action brought by the Commission for violations of Rule 10b-6 of the
Exchange Act, the predecessor to Rules 101 and 102 of Regulation M, a district court entered an
injunction against future violations of the successor Rules.  See SEC v. Mersky, Civ. Act. No.
93-CV-5200 (E.D. Pa. Jul. 28, 2006) (final judgment and order by default).  Similarly, in
administrative proceedings to enforce the federal securities laws, the Commission has entered
administrative cease-and-desist orders to prevent violations of revised regulations.  See, e.g., In
re Goldman Sachs Execution & Clearing, LP, 2007 SEC LEXIS 491, *17 (Mar. 14, 2007)
(Respondents violated Rules 10a-1(d) and 10a-2; ordered to cease and desist from violating
Rules 200(g) and 203(a) of Regulation SHO) (settled matter); In re A.S. Goldmen & Co., Inc.,
2002 SEC LEXIS 3252, ** 11-12 (Dec. 19, 2002) (Respondents violated Rule 10b-6; ordered to
cease and desist from violating Rule 101 of Regulation M) (settled matter); In re Americorp
Secs. Inc., 1999 SEC LEXIS 1593, *13 (Aug. 11, 1999) (same); In re Price, 1998 SEC LEXIS
692, *8 (Apr. 19, 1998) (same).

[8]  While Regulation M is the successor regulation to Rule 10b-6, their respective provisions were
not identical:

As with the rule at issue in U.S. Envtl., the amended Rule 105 is a successor to former

Rule 105.[9]  By analogy, if the Defendants' conduct as alleged violated Rule 105, the Court

would have the authority to issue an injunction with respect to that rule, as it exists today.  Rule

105 remains in existence today and that rule, like its prior versions, *prohibits the very same*

*conduct that is alleged in the Complaint.*  Both versions govern short selling in connection with

public offerings and both address the concern that short selling can artificially depress market

prices and cause an issuer's offering proceeds to be reduced.  See Short Selling in Connection

with a Public Offering, 72 Fed. Reg. 45094 (Aug. 10, 2007).  The amended version did away

with the "covering" element of the former version, prohibiting purchasing offered securities in

---

The provisions of Regulation M that are analogous to Rule 10b-6 are contained in Rules 101 and 102, which cover distribution participants, and issuers and selling security holders, respectively. Rules 101 and 102 apply only during a "restricted period" that commences one or five business days before the day of the pricing of the offered security and continues until the distribution is over. The restricted periods are based on the trading volume value of the offered security and the public float value of the issuer, rather than the price per share and public float criteria used in Rule 10b-6, and generally are of a shorter duration than the cooling-off periods under Rule 10b-6. Furthermore, the restricted periods of Regulation M focus on the time of pricing. In contrast, Rule 10b-6 imposed restrictions during the entire distribution, which could extend over a lengthy period of time, but excepted certain trading activities prior to a two or nine business day "cooling-off period." The applicable cooling-off period was keyed off the commencement of offers or sales. While Rule 10b-6 was designed to protect the pricing of an offering, certain distribution methods, particularly in connection with foreign offerings, could result in the cooling-off periods commencing after an offering had been priced.

Anti-Manipulation Rules Concerning Securities Offerings, 1996 SEC LEXIS 3482, at *8.

[9] Notably, in the adopting release to Regulation M, by which the former trading practice rules, including Rule 10b-21, were supplanted, the Commission expressly stated its view that all outstanding injunctions and orders to cease and desist from violating the trading practice rules should continue in force and effect and should be considered injunctions or orders to cease and desist from violating the corresponding successor rule or rules under Regulation M.  See Anti-Manipulation Rules Concerning Securities Offerings, 62 Fed. Reg. 520, *539 (Jan. 3, 1997).

firm commitment offerings by any person that effected a restricted period short sale. See id.
Defendants' conduct here violated both the letter and spirit of Rule 105, even as amended.[10]
Therefore, utilizing the factors long-standing in Second Circuit and reiterated in U.S. Envtl., this
Court has the authority to enjoin Defendants from committing future violations of Rule 105, as
that rule presently exists. The Complaint alleges sufficient facts to support injunctive relief. If
those facts are deemed true, as they must be on a motion to dismiss, the equities weigh in favor
of such relief.

## II. DEFENDANTS' ARGUMENT THAT THE COMMISSION AMENDED RULE 105 RETROACTIVELY IS A RED HERRING AND IS INCORRECT

Defendants argue that the Commission's statements in its releases concerning conduct
designed to evade Rule 105 amount to substantive rulemaking. Specifically, Defendants argue
that, "[i]n interpreting Rule 105 to cover so-called 'sham transactions,' the Commission was
attempting to proscribe conduct that was not encompassed by Rule 105 when it was first
promulgated and apply the new interpretation *ex post facto*." (Def. Br. at 7.) First and foremost,
Defendants' argument is a red herring because the Commission does not allege that Defendants
used sham transactions to violate Rule 105; rather, Defendants used sham transactions to conceal
their violations of Rule 105 *after* committing those violations. Second, the Commission did not
engage in retroactive rulemaking.

## A.     Defendants' Rule 105 Violations Occurred Before They Engaged in Sham Transactions

Defendants' entire argument that the Commission's statements in its Releases amounted
to retroactive rulemaking is misplaced. The Commission alleges that Defendants violated Rule

---

[10] Defendants' conduct in attempting to conceal their violations of Rule 105 is the type of
conduct that prompted the revision of Rule 105. Indeed, Rule 105 was revised to "end the
progression of trading strategies designed to hide activity that violated the rule." Short Selling in
Connection with a Public Offering, 72 Fed. Reg. 45094.

105 with respect to at least eighteen separate offerings. (Compl. ¶ 1.) Eight of the eighteen specifically alleged did not involve the use of sham transactions[11]; ten did. The Commission has alleged that Defendants violated Rule 105 at least eight times *without* the subsequent use of sham transactions. Defendants do not even address why those allegations are insufficient, their *ex post facto* argument notwithstanding.

For the offerings involving Defendants' use of sham transactions, the Commission alleges that Defendants *first* committed Rule 105 violations when they covered their pre-offering short position with shares purchased in the offering. (Compl. ¶¶ 32, 34, 36, 38, 40, 42, 44, 46, 48, 50.) *After* the violations, Defendants subsequently engaged in sham transactions in an effort to conceal their violations. (Id.) Defendants used the First-In-First-Out method, or FIFO, to account for its purchases and sales of securities, so that shares acquired in the offering first covered any open short position. (Compl. ¶ 21.) Thus, the subsequent contemporaneous orders to buy and sell in the open market were not part of the alleged Rule 105 violations, except as evidence that the Defendants tried somehow to camouflage their earlier, violative trading.

---

[11] In two instances, Defendants' broker was specifically instructed to use shares purchased in the offering to cover the pre-offering short position. (Compl. ¶¶ 23, 24.)

**B.    The Commission Releases Did Not Change the Meaning of Rule 105 or Attempt to Prohibit Conduct Not Already Encompassed by Rule 105**

> **1.    The Commission Simply Stated That It Had Taken Action, and Would Continue to Take Action, With Respect to Conduct Designed to Evade Rule 105**

On November 6, 2003, the Commission proposed rules that included amendments to Rule 105.[12] Short Sales, 68 Fed. Reg. 62972 (Nov. 6, 2003) ("Proposing Release").  In the Proposing Release, the Commission stated that it had recently:

> become aware of, and taken action, with respect to conduct designed to evade, but which violates Rule 105 of Regulation M [footnote omitted].  This conduct may involve short sales within the restricted period of Rule 105, the purchase of offering shares, and the contemporaneous sale and purchase of the same class of shares as the offering shares.  For example, an individual may sell the shares in the market and immediately purchase an equivalent number of shares.  Where the transaction is structured such that there is no legitimate economic purpose or substance to the contemporaneous purchase and sale, no genuine change in beneficial ownership, and/or little or no market risk, that transaction may be a sham transaction.  The Commission would continue to consider enforcement action against those participating in sham transactions, structured in a manner to give the appearance of compliance with Rule 105, but in fact, violate the rule.  We are not proposing revisions to Rule 105 with respect to activities that violate the current rule.  We seek comment, however, on criteria in addition to economic purpose or substance, change in beneficial ownership, and market risk, that may distinguish sham transactions from legitimate trading.

Id., 68 Fed. Reg. 62972, at * 62999.  In the Proposing Release, the Commission was explaining that it had taken action, and would continue to take action, with respect to conduct designed to evade Rule 105.  And, as of that time, the Commission had taken action against such conduct.  See In re Ascend Capital, LLC, 2003 SEC LEXIS 1659 (Jul. 17, 2003) (order instituting settled

---

[12] Defendants incorrectly state:  "'Sham transactions' were first mentioned in the Regulation SHO Proposing Release in July, 2004."  (Def. Br. at 8.)  The Proposing Release was issued November 6, 2003.

administrative proceedings).[13]  The Commission was not, as Defendants argue, changing the original meaning of the rule or attempting to prohibit conduct that was not already encompassed by Rule 105.

In the Proposing Release, the Commission solicited comment regarding whether there should be additional language in the text of Rule 105 to address conduct that caused the harm Rule 105 was designed to prevent.  Short Sales, 68 Fed. Reg. 62972, at *62999.  The Commission received no comments in response and stated, in the release adopting Regulation SHO:

> We do not believe it necessary or desirable to add rule language to address these kinds of trading, as this activity violates the current rule and can vary in its details.  The Commission will continue to enforce Rule 105 in the face of sham transactions designed to evade the Rule.

Short Sales, 69 Fed. Reg. 48008, at *48021 ("Adopting Release").

In the Adopting Release, the Commission gave interpretive guidance concerning sham transactions and, specifically provided two examples of sham transactions that would violate Rule 105, Short Sales, 69 Fed. Reg. 48008, at *48021.  Defendants claim that this is the Commission's "*first and only* interpretative guidance with respect to Rule 105." (Def. Br. at 4.). First, it should be noted, neither of the two specific examples in the Regulation SHO release describes Defendants' alleged conduct.  Rather, the two examples relate to (1) prearrangements between a short seller and a third party who acquires securities in the offering, and (2) slight-of-hand trading involving a sale of offering shares into the open market and a contemporaneous purchase of the equivalent number of shares in the open market, which are then used to cover.

---

[13]  The Commission has brought numerous enforcement actions against violations of Rule 105 and its predecessor, former Rule 10b-21, since its adoption in 1988.  See, e.g., SEC v. Essaye, 1995 SEC LEXIS 1796 (Jul. 26, 1995); SEC v. Ivey, 1994 SEC LEXIS 1068 (Apr. 5, 1994).

Short Sales, 69 Fed. Reg. 48008, at *48021. Defendants took neither of these approaches. They used the purchased offering shares to cover their pre-offering short positions, and then engaged in sham transactions as a camouflage.

Second, the Commission had always been clear about how it considered the use of sham transactions to conceal Rule 105 – or any other kind of – violations . See id. ("The Commission will continue to enforce Rule 105 in the face of sham transactions designed to evade the Rule."). In fact, the Commission had taken enforcement action against such conduct prior to its interpretive release. See Ascend Capital, LLC, 2003 SEC LEXIS 1659 (settled proceedings against investment advisor to hedge funds and its employees for violating Rule 105 by using sham transactions). And, as early as the adoption of Rule 105's predecessor, Rule 10b-21, the Commission explained its view that a person is prohibited from doing indirectly any act that he is prohibited from doing directly.[14] Short Sales in Connection with a Public Offering, 1988 SEC LEXIS 1706, at *16.

It was in 2007 that the Commission adopted an amendment Rule 105 to address the "continued violations of the rule, including a proliferation of trading strategies and structures attempting to accomplish the economic equivalent of the activity that the rule seeks to prevent."

---

[14] Defendants make much of the fact that when Rule 105 was first promulgated, the Commission first proposed a rule that would have prohibited a short seller from "directly or indirectly" covering short sales with securities purchased in an offering, but instead chose to omit the phrase "directly or indirectly" when describing the prohibited conduct. What Defendants fail to address is the Commission's reason for doing so. It did so to avoid a broad interpretation of that language to "bring within the Rule transactions in which a person acquired in the marketplace offered securities from persons who had purchased in the offering, but where there was no arrangement or understanding" among those persons to evade the Rule. Short Sales in Connection with a Public Offering, 1988 SEC LEXIS 1706, *16. Moreover, the Commission explained that rule without the phrase "directly or indirectly" would cover such arrangements or understandings because Section 20(b) of the Exchange Act already prohibits a person from doing indirectly any act that he is prohibited from doing directly by the Exchange Act or any rule thereunder. Id. (citing 15 U.S.C. § 78t(b) (Section 20(b) of the Exchange Act)). Thus, the phrase "directly or indirectly" in Rule 105 was considered unnecessary.

Short Selling in Connection With a Public Offering, 72 Fed. Reg. 45094.  In connection with this

amendment, Defendants take comments made by Dr. Erik R. Sirri, Director of the Commission's

Division of Market Regulation (now named the Division of Trading and Markets), at a

December 4, 2006, Commission public meeting out of context to prove their assertion that Rule

105 had been vague and unclear.  (Def. Br. 4.)

When taken in context, the comments at the December 4, 2006 public meeting did not

evidence that Rule 105 was vague or unclear in any way.[15]  At that meeting, Dr. Sirri presented a

proposed change to Rule 105.  In a preface to Dr. Sirri's presentation, the Chairman noted:

> [Rule 105] is designed to prevent manipulative activity that can artificially depress
> market prices and reduce offering proceeds. But there's ample evidence that the rule
> doesn't always work as its intended. *The Commission is aware of a significant level of
> non-compliance with Rule 105.  And we've had to bring a large number of enforcement
> actions in the last few years against a proliferation of strategies that manipulators have
> developed to conceal their violations of the Rule.* To address these concerns, we are
> today considering an amendment to Rule 105 that will establish a bright-line test for
> compliance. Instead of prohibiting a person from covering a short sale just before an
> offering with securities from the offering, the amendment would simply prohibit any
> short seller during the Rule 105 restricted period from purchasing any securities in the
> offering. Period. In other words, it would eliminate the Rule's covering component. *The
> purpose of this amendment is once and for all to put an end to the progression of schemes
> that have been engineered to camouflage covering activity that's already outlawed, or
> supposed to be outlawed, by Rule 105.*

http://www.connectlive.com/events/secopenmeetings/2006index.html, at 1:23:22 (emphasis

added). The Chairman asked Dr. Sirri to detail how a bright-line test will help the Commission in

achieving the purpose of Regulation M and its prophylactic nature. Dr. Sirri replied:

> One of the problems with the … standing version of the rule was non-compliance.  The
> purpose of the rule is clear.  It's intended to prohibit manipulative behavior.  The
> question of what constitutes a covering transaction is a difficult one.  Covering can be
> disguised in manipulative, in many ways.  The modification [to the rule] we [Market

---

[15]  An audio recording of the Commission's December 4, 2006 public meeting at which Eric Sirri
made his comment was taped and is available at
http://www.connectlive.com/events/secopenmeetings/2006index.html.  A discussion of the
proposed changes to Regulation M begins at 1:20:43.

Regulation] propose today is one that provides a bright line that separates from the word [or world] of covering to a world where we are just talking about participation in the offering. We hope that bright line will provide traders, and people out in the market with clear guidance so that they do not cross the line that interferes with the purpose of the rule.

Id. at 1:30:20. Later in the discussion, Commissioner Paul Atkins noted:

The proposed amendments to Rule 105 of Reg M, seek to provide clarity in an area that's being subject to abuse and trickery. Despite what we thought was clear guidance in this area, we've seen through our enforcement program several practices that may have come close to the letter but certainly contravened the spirit of the Rule.

Id. at 1:33.01

Based on these statements, the amendment to Rule 105 was not occasioned by the Rule's lack of clarity. The amendment sought to stop the proliferation of schemes – or "trickery" – that traders were employing to *conceal* their illegal covering or to make it difficult to detect whether they had violated.

Notably, twelve of the eighteen violations by the Defendants occurred *after* the date of the Commission's November 2003 release which discusses sham transactions. (Compl. ¶ 53.) Seven of those twelve involved sham transactions. (Id.) Defendants do not explain why, if they were confused by Rule 105 before the Commission's statements about sham transactions, their confusion was not put to rest by November 2003, such that they did not then continue to commit violations of Rule 105. In fact, Defendants continued to violate Rule 105 even after they knew on or about July 17, 2003 that the Commission staff was investigating Defendants' participation in certain equity offerings. (Compl. ¶ 52.) Despite having actual notice of the Commission's investigation, Defendants continued to violate Rule 105, committing fourteen of the eighteen violations described above after July 17, 2003. (Id.) Defendants committed nine of the ten violations involving the use of sham transactions after learning of the Commission's investigation. (Id.)

2. **The Commission Is Free to Make Specific Interpretations of General Rules on a Case-By-Case Basis in Adjudicatory Proceedings**

Defendants apparently would have the Court believe this is a case of "first impression." The Commission's November 6, 2003 Proposing Release makes clear that the Commission had already taken action with respect to conduct designed to evade Rule 105. Short Sales, 69 Fed. Reg. 48008, at \*48021. However, even if this were a case of first impression, it would not affect the Commission's authority to enforce Rule 105 by adjudication. The Supreme Court long ago held that the Commission may choose to act either by rule or by individual order, and thus may make specific interpretations of general rules on a case-by-case basis in adjudicatory proceedings and apply those interpretations to the parties in those proceedings. SEC v. Chenery Corp., 332 U.S. 194, 202-03 (1947). The Supreme Court's rationale of nearly 60 years ago applies with equal force here:

> [T]he agency must retain power to deal with the problems on a case-to-case [sic] basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.

Id. at 203; see also In re KPMG Peat Marwick LLP, 2001 SEC LEXIS 98, \*77 n.94 (Jan. 19, 2001), reh'g denied, 55 S.E.C. 1 (2001), pet. denied, 289 F.2d 109 (D.C. Cir. 2002). ("[B]ecause [the Commission] cannot foresee every possible application of rules, [it] may determine specific applications on a case-by-case basis in adjudication."). Thus, the Commission's decision to prosecute the multitude of varying schemes it encounters that violate Rule 105 allows it to maintain the flexibility it needs to combat these schemes as they are devised. Its decision to reject regulation by writing specific and rigid rules to cover every conceivable scenario forecloses arguments by Defendants who defend their fraudulent conduct by claiming that "there's no exact rule against it." See Chenery, 332 U.S. at 203-04 ("[T]he argument of

retroactivity becomes nothing more than a claim that the Commission lacks the power to enforce the standards of the Act in this proceeding.  Such a claim deserves rejection.").

### 3.   "Sham transactions" Have Long Been Considered Manipulative Devices

As a smokescreen to obfuscate their violative trades, Defendants placed "matched orders," which are "orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206 n.25 (1976). Such trades are sham transactions.[16]

Defendants cannot plausibly argue that Rule 105 created any confusion about the propriety of sham transactions.  Sham transactions are universally considered a manipulative device and any claim by Defendants that they were confused about that is disingenuous.  In the securities arena, the types of trades Defendants engaged in to conceal their violative trades are considered "inimical to the public interest," Hochfelder, 425 U.S. at 205, and manipulative "per se," Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 595 (10th Cir. 1979).  Courts and the Commission have long recognized sham transactions as manipulative.[17]

---

[16] Matched orders are sham transactions because they give the appearance of submitting trades to the open market, while negating the risk or price competition incident to such a market. Cf. Charles R.P. Pouncy, The Scienter Requirement and Wash Trading in Commodity Futures: The Knowledge Lost in Knowing, 16 Cardozo L. Rev. 1625, 1635 n.55 (1995); see also In re Collins, 1986 CFTC LEXIS 661, at *22 (Apr. 4, 1986), rev'd on other grounds sub nom. Stoller v. CFTC, 834 F.2d 262 (2d Cir. 1987) ("[T]he central characteristic is the "use of trading techniques that give the appearance of submitting trades to the open market while negating" risk and price competition); accord In re Bear Stearns & Co., 1991 CFTC LEXIS 46, at *33 (Jan. 25, 1991) (the intentional creation of a nullity is not a bona fide transaction). Essentially, with a matched order, a trader effectively buys from and sells to himself so that there is no change in the trader's financial position; thus, there is no risk to the trader and the price of the orders is of little consequence. See Collins, 1986 CFTC LEXIS 661, at *7.

[17] In many instances, the Commission and the courts have held that sham transactions (those that don't reflect economic reality) – whether they are called "wash trades," "matched trades,"

22

The notion that the Commission has ever been unclear about whether sham transactions can be used to cover up other manipulative transactions (such as violations of Rule 105) is simply absurd. A central "purpose of the [securities laws] is to prevent rigging of the market and to permit operation of the natural law of supply and demand." United States v. Stein, 456 F.2d 844, 850 (2d Cir. 1972). The Exchange Act was intended to "insure the maintenance of fair and honest markets." 15 U.S.C. § 78b. In enacting the statute, Congress sought to provide "open markets for securities where supply and demand may freely meet at prices uninfluenced by manipulation or control." S. Rep. No. 1455, 73d Cong., 2d Sess. 81 (1934); accord H.R. Rep.

---

"round-trips" or "parking" – are unlawful. See, e.g., United States v. Jones, 900 F.2d 512, 515 (2d Cir. 1990) (noting that since "the agreement to resell ensures that the 'seller' never loses control of the securities, the government considers 'parking' a form of tax and securities fraud."); SEC v. Hopper, 2006 U.S. Dist. LEXIS 17772, *3 (S.D. Tex. Mar. 24, 2006) (rejecting motion to dismiss of defendants who engineered a series of unlawful round-trip transactions to make their energy company's trading activity appear vigorous and boost reported revenues); In re Enron Corp. Secs. Derivative & "ERISA" Litig., 310 F. Supp. 2d 819, 829-30 (S.D. Tex. 2004) (rejecting motion to dismiss 10b-5 claim of broker who engaged in parking transaction designed to move assets off the books and records of issuer to improve issuer's year end income statement); In re XCEL Energy, Inc. Secs., Derivative & "ERISA" Litig., 286 F. Supp. 2d 1047, 1050 & n.1, 1056 (D. Minn. 2003) (anti-fraud complaint against energy company withstood motion to dismiss since subsidiary's SEC filings reported significant growth in revenue from its trading based in large part on revenue from improper round trip trades, or "wash trades," with third party of energy contracts); SEC v. Rathi, 2003 SEC LEXIS 1805, *1 (Jul. 31, 2003) (two respondents effected unlawful wash sales for the purpose of manufacturing tax losses); In re Thornton & Co., 1948 SEC LEXIS 432, *7 (Jul. 14, 1948), aff'd, 171 F.2d 702 (2d Cir. 1948) (unlawful sham transactions were found part of a financing strategy akin to a check-kiting scheme); In re Jett, 2004 SEC LEXIS 504, at *42 (Mar. 5, 2004) (a trader at a broker-dealer used unlawful sham transactions to book illusory trading profits); In re Graham, 1998 SEC LEXIS 2598 (Nov. 30, 1998), aff'd on other grounds, 222 F.3d 994 (D.C. Cir. 2000) (broker-dealer's customer engaged in unlawful sham transactions to receive sales proceeds in cash during the settlement period).

Although the majority of these cases were decided under the anti-fraud provisions of the securities laws (Sections 10(b) and Rule 10b-5 under the Securities Exchange Act of 1934), they comment specifically on the manipulative nature of sham transactions. Like the anti-fraud rules, Rule 105 is intended as an anti-manipulation rule. See Short Selling in Connection with a Public Offering, 72 Fed. Reg. 45094. Thus, these cases are apposite for the point for which they are cited: that sham transactions are considered manipulative devices.

No. 1383, 73d Cong., 2d Sess. 11 (1934).  Accordingly, any activity involving sham transactions – which by their nature do not involve the natural operation of supply and demand – is prohibited.  See Hochfelder, 425 U.S. at 205-06 (sham transactions have no useful function); Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977) (sham transactions are manipulative); Mawod, 591 F.2d at 595 (sham transactions are per se manipulative or deceptive devices prohibited by Section 10(b)); SEC v. Kimmes, 799 F. Supp. 852, 859 (N.D. Ill. 1992) (Rule 10b-5 prohibits any conduct that falsely represents that activity in a security is "the reflection of a genuine demand" when in fact it is "a mirage" (citation and internal quotation omitted)), aff'd sub nom., SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993).  The purpose of Rule 105 is to ensure that the market is determined by independent market dynamics, and not by trades done to depress prices, lock in profits or cover up other illicit trading.  See Short Selling in Connection with a Public Offering, 72 Fed. Reg. 45094.

## III.    PLAINTIFF'S CLAIMS FOR DISGORGEMENT, PREJUDGMENT INTEREST AND CIVIL PENALTIES, AND PLAINTIFF'S ALLEGATIONS NOT INVOLVING SHAM TRANSACTIONS REMAIN UNCHALLENGED

Defendants have not asserted that Plaintiff's claims for disgorgement, prejudgment interest and civil penalties are insufficient.  The Court's authority to order these remedies in a Commission enforcement action is well established.  See, e.g., Manor Nursing Ctrs., 458 F.2d at 1104; SEC v. Tome, 638 F. Supp. 638 (S.D.N.Y. 1986), aff'd 833 F.2d 1086 (2d Cir. 1987); 15 U.S.C. § 78u(d)(3).

Finally, Defendants are alleged to have committed eight separate violations of Rule 105 that did not involve sham transactions whatsoever.  (Compl. ¶¶ 23-30.)  Defendants have failed to address why these allegations are insufficient.  Thus, these claims should stand undisturbed as well.

**IV.    IF THE COURT GRANTS DEFENDANTS' MOTION, THE COMMISSION SHOULD BE AFFORDED AN OPPORTUNITY TO REPLEAD**

If the Court determines that Defendants' motions should be granted, the Commission requests leave to replead.  Leave to amend is almost always granted to plaintiffs whose claims are dismissed.  See, e.g., Log on Am. v. Promethean Asset Mgmt. LLC, 223 F. Supp. 2d 435, 452 (S.D.N.Y. 2001).

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion in all respects.  If the Court should grant the Motion, Plaintiff respectfully requests that it be granted the right to amend its Complaint.  Defendants' request for an award of costs and attorneys fees should be denied.

Dated:        New York, New York
              January 3, 2008

                              Respectfully submitted,

                              _s/ Valerie A. Szczepanik_____
                     By:      VALERIE A. SZCZEPANIK
                              Counsel for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              3 World Financial Center – Room 400
                              New York, New York 10281-1022
                              Ph: (212) 336-0175
                              Fx: (212) 336-1317
                              szczepanikv@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2008, the foregoing document was filed with the

Clerk of the Court and served by Federal Express Overnight delivery to:

Ira Lee Sorkin, Esq.
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 277-6500
Attorney for the Defendants


    s/ Valerie A. Szczepanik
VALERIE A. SZCZEPANIK
Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – Room 400
New York, New York 10281-1022
Ph: (212) 336-0175
Fx: (212) 336-1317
szczepanikv@sec.gov